Argued 21 June, decided 17 July, 1905.

## OREGON IRON CO. *v.* HUGHES.

81 Pac. 572.

PROPERTY QUALITY OF METEORITES.*

1. Meteorites, though not imbedded in the earth, are real estate, and consequently belong to the owner of the land on which they are found, in the absence of proof of severance : *Ferguson* v. *Ray,* 44 Or. 557, distinguished.

METEORITE—EVIDENCE OF SEVERANCE.

2. Mere evidence of a tradition that Indians reverenced a meteorite, washed their faces in the water contained therein, and treated it as a kind of magic or medicine rock belonging to the medicine men of the tribe, and that there were fantastic holes therein, thought to have been made by the Indians, is not sufficient to justify an inference that the Indians severed the meteorite from the realty, and thereafter abandoned it, so that the next finder became entitled to it.

---

* NOTE.—See extensive classified notes, Right of Finder to Property Found, 1 Am. & Eng. Ann. Cas. 4; and Rights and Liabilities of Finder of Property, 37 L. R. A. 116; 102 Am. St. Rep. 632.

As to Larceny of Lost Property see 88 Am. St. Rep. 591–594, and 37 L. R. A. 121–126.                                                              REPORTER.

From Clackamas: THOMAS A. McBRIDE, Judge.

Replevin action by the Oregon Iron & Steel Co. against Ellis Hughes, for the possession and ownership of a meteorite discovered by defendant on plaintiff's land and secretly removed. Plaintiff prevailed.        AFFIRMED.

For appellant there was an oral argument by *Mr. Górden E. Hayes, Mr. Charles D. Latourette* and *Mr. D. Clinton Latourette*, with a brief to this effect.

I. Whatever movables are found upon the surface of the earth, or in the sea, and are unclaimed by any owner, are supposed to be abandoned by the last proprietor, and as such are returned into the common stock and mass of things, wherefore they belong, as in a state of nature, to the first occupant or finder: 2 Bl. Com. 258, 402; *McLaughlin* v. *Waite*, 5 Wend. 410 (21 Am. Dec. 232); *Eads* v. *Brazilton*, 22 Ark. 501 (79 Am. Dec. 88); *State* v. *Taylor*, 27 N. J. 121; *Sideick* v. *Duran*, 67 Tex. 262; *Amory* v. *Flyn*, 10 Johns. 102 (6 Am. Dec. 316); *Bowen* v. *Sullivan*, 62 Ind. 281 (30 Am. Rep. 172); *Tancil* v. *Seaton*, 28 Grat. 601 (26 Am. Rep. 380).

II. Under the Roman law, when treasure was found by one person on the land of another, one half thereof was given to the finder and the other half to the owner of the land (Mackenzie, Roman Law, 170; *Livermore* v. *White*, 74 Me. 452, 43 Am. Rep. 600); but under the English and American law the finder of property not claimed by any owner is entitled to it all, even against the owner of the land on which it is found.

The place in which a lost article is found does not affect the general rule that the finder is entitled to it against every one but the owner: *Durfee* v. *Jones*, 11 R. I. 588 (23 Am. Rep. 528); *Bowen* v. *Sullivan*, 62 Ind. 281 (30 Am. Rep. 172); *Hamaker* v. *Blanchard*, 90 Pa. 377 (35 Am. Rep. 664); *Totum* v. *Sharpless*, 6 Phila. 18.

III. The authorities regard lost or abandoned articles as things fallen back into the common stock, and the finder's title is made to rest purely upon the ground of prior occupancy. Such articles are the property of him who first reduces them to possession : 2 Bl. Com. 402; *Sovern* v. *Yoran*, 16 Or. 269 (8 Am. St. Rep. 293, 20 Pac. 100); *Danielson* v. *Roberts*, 44 Or. 108 (65 L. R. A. 526, 102 Am. St. Rep. 627, 74 Pac. 913).

As to articles which have never been owned, which have not been out of the common stock and mass of things, the same rule holds in the main, and he who first captures the chattel may hold it against the world : *Tabor* v. *Jenny*, 1 Sprague, 315; *Young* v. *Hickens*, 1 Dav. & M. 592; *Amory* v. *Flyn*, 10 Johns. 102 (6 Am. Dec. 316).

Before this aerolite reached the earth it unquestionably belonged to the common mass and stock of things, and therefore was not the property of any one. When it reached the earth it was appropriated by the Indians, who claimed it and erected it on the mound, and used it until their tribal relations ceased. The proper principle to apply in this case is that of original acquisition. Unlike the Iowa meteor case, it did not fall upon and bury itself in the soil, and thereby partake of the nature of its environment. And, unlike the meteor in that case, it did not require excavation by physical effort to remove it, which would of itself constitute a trespass upon the land ; but it stood there erect like a sentinel, like a Tomanowos. No one saw it fall, nor is it shown where it struck. It may have fallen an hundred years ago or a hundred miles away— no one can tell. It assuredly, however, did not fall at the particular point where it was discovered by the appellant, as the necessary impact would have driven it into the face of the earth far beyond the view of man. The distinguishing feature between the case at bar and the quartz case of *Ferguson* v. *Ray*, 44 Or. 557 (1 Am. & Eng. Ann. Cas. 1,

102 Am. St. Rep. 648, 1 L. R. A. (N. S.) 447, 77 Pac. 600), is that this article was found on the surface of the earth, while the quartz was imbedded in the soil.

It may have been found by the Clackamas Indians, perhaps they saw it fall, but, however that may be, the record does show that they appropriated it to their own uses, they gouged out its interior into those fantastic potholes, one of which is large enough to hold a child — no other reasonable theory of their existence has been advanced. The Indians raised it to a standing position upon a prominent knoll, they maintained and used it in their warfare, and when it was abandoned, it became in law the same as an arrow, or spear head, or tomahawk, an Indian relic, left for him who should come after them who could see value or interest enough in the thing to pick it up and carry it away.

For respondent there was a brief over the name of *Williams, Wood & Linthicum*, with an oral argument by *Mr. Stewart Brian Linthicum* and *Mr. J. Couch Flanders*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The defendant in November, 1902, discovered upon the land of the plaintiff an irregularly shaped mass of iron, with infusion of nickel and a trace of cobalt, weighing several tons, supposed to be of meteoric origin, and shortly afterwards, without the knowledge or consent of the plaintiff, removed the same to his own premises. The plaintiff, upon ascertaining the fact, demanded the property, and, being refused, brought this action to recover it, and, having obtained judgment, the defendant appeals.

1. The trial court instructed the jury upon the theory or assumption that the mass, or, as it is generally denominated in the proceeding, the meteorite, when removed, was real property, or a part of the soil, and belonged to the owner of the soil, and therefore left to the jury for

their determination the sole question whether it was found upon and removed from the land of the plaintiff. This the jury found in plaintiff's favor, which settled the controversy in that court. The defendant requested instructions with a view to having submitted to the jury the theory that the property was very early appropriated by the Indians and utilized and worshiped by them as a sacred object, and, having been so appropriated, it became and was personalty in their hands; that they subsequently abandoned it; and that the defendant, being the finder, became the owner, and is entitled to it, as against the owner of the realty upon which it was found. The theory carries with it also the idea that the mass is in reality a meteorite, brought to the earth from some planet through natural causes. In physical appearance it is in the shape of a huge mushroom or an inverted bell, in dimensions 7 feet by 10 across the top, and 4½ feet thick, and when found was resting with its smaller end upon the surface of the earth, not imbedded in it, but within a saucer-like depression, with hazel bushes growing up about it. Its position was on the top of a knoll or eminence, with an incline in either direction, except towards the north. In its top, as it rested in place, are numerous cavities, or "potholes," as they are termed, of larger or smaller dimensions, some of them being 14 inches in depth; the whole mass being corroded, rusty and moss-grown. Granite bowlders were also found in proximity to it. Before alluding to the evidence upon which defendant's theory is based, we may state the law relative to the nature of a meteorite or aerolite—whether realty, being a part of the soil upon which it is discovered, or personalty, belonging to the finder.

The question has been resolved by a case from Iowa (*Goodard* v. *Winchell*, 86 Iowa, 71, 52 N. W. 1124, 17 L. R. A. 788*, 41 Am. St. Rep. 481) favorably to the view that it is

---

*NOTE.— The briefs of counsel are printed with this report.— REPORTER.

realty. As disclosed by the record, the facts of that case were that a person saw an aerolite fall upon the land of another, which buried itself in the ground to a depth of three feet, becoming imbedded therein; that on the day following he dug it up and removed it to his own premises, and claimed the ownership; but it was decided otherwise, that is, that it belonged to the owner of the soil. In determining the question, the court, speaking through Mr. Justice Granger, said: "The subject of the dispute is an aerolite. * * It came to its position in the earth through natural causes. It was one of nature's deposits, with nothing in its material composition to make it foreign or unnatural to the soil. It was not a movable thing 'on the earth.' It was in the earth, and in a very significant sense immovable; that is, it was only movable as parts of the earth are made movable by the hand of man. Except for the peculiar manner in which it came, its relation to the soil would be beyond dispute. It was in its substance, as we understand, a stone. It was not of a character to be thought of as 'unclaimed by any owner,' and because unclaimed, 'supposed to be abandoned by the last proprietor,' as should be the case under the rule invoked by appellant. In fact, it has none of the characteristics of the property contemplated by such a rule." And it was held that, having none of the characteristics of personalty, it became, by falling on the earth through the course of nature, a part of the soil, and hence that the ownership was determined by the ownership of the soil.

There is a distinction sought to be made here by reason of the fact that this meteoric mass was discovered distinctly on the surface of the earth, not beneath it, and therefore that it could not at all be considered a part of the soil. The fact that granite bowlders were lying in proximity to where it was found would indicate that it might have been deposited there through the instrumentality of

an ice floe, although apparently of meteoric origin, and the cavities in the crown may have been the result of erosion by the enginery of the water as well as that of oxidation through fervent heat; and this would satisfactorily account for its position on the surface of the earth, and not beneath it. Again, if, as argued, its natural propensity was to bury itself in the soil by reason of the impact resulting from the great velocity of its descent from the heavens, it may have been thrown out by force of an eruption, or uncovered by the decomposition or erosion of the natural deposits about it; but, however that may be, much of it being mere matter of conjecture rather than of scientific discovery and demonstration, there is one thing sure about the inquiry, and that is that the mass is one of nature's deposits, and presumptively it was primarily a part of the soil or the realty upon which it was discovered. The plaintiff's case was made, prima facie, therefore, when it was shown that the mass, whether of meteoric or glacial origin, was resting upon its land, for, without other proofs showing a severance and appropriation, it existed in a state of nature, and partook of the realty, as iron ore would partake of the realty, whether found beneath or upon the surface of the earth.

2. Upon the other hand, in order for the defendant to succeed upon his theory, he was required to show by competent proofs a severance of the mass from the realty by the Indians, its appropriation by them, their subsequent abandonment of it by leaving it upon the surface of the earth, and defendant's discovery of it. It would be sufficient, however, for the submission of his cause to the jury, if there was evidence adduced from which they might reasonably infer that all these essentials to his defense existed in fact. If so, the requested instructions should have been given; otherwise not.

In substantiation of this defense, Susap, a Klickitat Indian, 70 years of age, and about the last of his tribe, was called, who testified that when he was a young boy he used to go hunting with Wachino, a Clackamas chief; that he often saw the meteorite; and that there were lots of trees around it then. The stumps, as the evidence shows, are there at the present time, measuring from three to seven feet over, and some of them are very near to where it lay. Continuing, he says the old chief told him and the other Indians that the object in question was iron; that it had a hole in it; that when it rained the water fell in there, and that the Indians went there and washed their faces in the water, and put their bows and arrows in it that they used in time of war; that the medicine men said it came from the moon; and that the Indians called it "Tomanowos." Sol Clark, 47 years of age, whose mother was of the Wasco tribe of Indians, was also called, who testified that his mother told him that there was a place up there where the Indians used to go to this Tomanowos; that they used to send their young people out there — generally made them go on dark nights — and that the Tomanowos was a kind of bowl or rock that had some holes in it; and on cross-examination, that the Clackamas Indians used the rock; that it was a kind of magic or medicine rock, and belonged to the medicine men of the tribe, but that witness claimed no interest in it. This constitutes, in substance, all the testimony bearing upon the subject.

Now, it is argued with much zeal that it is inferable from this testimony that the meteorite is an Indian relic; that it was an object of worship — a "Tomanowos," whatever that term implies; that the Indians must have at some time dug it from beneath the earth, where it naturally would have buried itself by impact from its fall; that they must have removed and erected it to a standing position at the place where found, and carved out the interior

into "those fantastic potholes"; and that they maintained
it there, and venerated and used it in their warfare, and
thereby they severed it from the soil and appropriated it
to their own use, rendering it personal property in their
hands; that presumably they forsook and discarded it;
and that it became abandoned property, and as such the
property of the finder. But what is there to show that
the Indians dug it from the earth and erected it in place,
except its posture, or that they carved out the holes in its
crown, except that they are there?  No witness said that
they did this, and what has been related concerning their
use of the object is traditional. Such evidence is very
meager from which to infer the substantial facts involved
for the predication of the defense relied upon. Nature does
many fantastic things, and presumably these are the re-
sult of natural causes, and the cavities contained therein
are attributable to the same agency. As against this pre-
sumption there could be no rational inference that the
Indians dug it from beneath the surface of the earth and
removed and erected it in the position in which it was
found in the dense forests, where it must have lain for
some time, considering its great weight. Nor that they hol-
lowed out the potholes in its crown, considering the almost
impenetrability of the substance, and the primitive tools
and implements with which they had to do their work.
So that, conceding that it was an object susceptible of
Indian worship, the fact does not afford reasonable infer-
ence that it was severed from the soil and appropriated
by them. They may have worshiped and utilized it, dip-
ping their bows and arrows and laving their faces in the
water accumulating in these bowls ; but all this they could
well have done without an appropriation, as tradition tells
us they worshiped Mt. Hood and other immovable objects
as they existed in a state of nature, and there could have

47 OR.——21

been no severance or appropriation by such use. So we conclude in this case that there was not sufficient evidence even to go to the jury, from which they would be permitted to infer that this was once Indian property, which they later abandoned, or that it is an Indian relic, and hence that the finder is not entitled to the ownership.

Nor is this case ruled by *Ferguson* v. *Ray*, 44 Or. 557 (77 Pac. 600, 1 L. R. A. (N. S.) 477, 1 Am. & Eng. Ann. Cas. 1, 102 Am. St. Rep. 648), for in that case there was unmistakable evidence, not mere conjecture, that the quartz, the subject of the action, had been removed from its natural deposit by the hand of some one and reduced to possession by severance from the realty, and was again deposited where found; but here there is no evidence, pertinent, from which it may be deduced that there had been a severance and appropriation by the Indians.

We have proceeded hereupon the hypothesis that Indian ownership and abandonment was sufficient upon which to predicate title in the finder of abandoned property, but we are not to be understood as deciding the question as matter of law, as applicable to Indian relics' and the like.

Seeing there is no error in the record, the judgment of the circuit court will be affirmed.          AFFIRMED.

---

Decided 4 December, 1905.